

FILED by ____ D.C.

ELECTRONIC

Apr. 19, 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

-------------------------------------------------------------------- X

Victims of Holocaust Art Theft,                                      :

                                        Plaintiff                    :

    - v -                                                         :    CIVIL ACTION #

The Czech Republic;                                                  :    **12-80420-CIV-Cohn/Seltzer**
National Gallery in Prague; and                                      :
Museum of Decorative Arts of Prague.                                 :

                                        Defendants.                  :

-------------------------------------------------------------------- X

Plaintiff, hereby files this Complaint against Defendants and states the following:

## INTRODUCTION

1.     This action seeks the recovery of valuable artworks belonging to the family of Richard and Regina Popper, a well-known Jewish Czech collector of art, who had amassed a significant collection of more than 125 paintings and other artworks (the "The Popper Collection").

2.     After their former country Czechoslovakia ceased to exist and the Nazi Protectorate of Bohemia and Moravia came into existence, Richard and Regina Popper were stripped of their nationality and citizenship rights due to the Nazi race laws of 1935 ("The Nuremberg Laws") were put into effect in 1939 and which were extended in 1941 (and made retroactive to March 1939) in The Protectorate.

3.     The Poppers were deported from Prague to the Lodz Ghetto and murdered in Lodz after arrival (in 1941 or 1942); however the exact date of their murder is not known.

4.     The Popper Collection included (i) paintings by old masters from the 15th to 19 century, including paintings of Flemish and Dutch painters of the 17th century, works of Italian painters of the 16th and 17th century, works of French and German origin from the 19th Century,

1

works of Austrian Masters from the 15th century; (ii) other objets d'art including a valuable Italian clock (iii) and other art not yet identified and located.

5.       The Popper Collection was of such value that the infamous Karl Hermann Frank, Minister of State as Reich Minister for Bohemia and Moravia, SS Senior Group Leader (*Obergruppenführer*) and General of Police in Prague and General of the Waffen SS, and successor to the assassinated Reich's Protector Reinhard Heydrich, choose some of The Popper Collection to take as his own.

6.       Plaintiff is an owner of certain rights to The Popper Collection obtained from Michal Klepetář (Klepetář)[1], the Popper heir/legal successor.

7.       Plaintiff has been involved with restitution, lobbying and political efforts related to locate, preserve and secure the return of assets confiscated by the Nazis and which in European Union countries, primarily former Eastern European countries, such as The Czech Republic, who have failed to honor international treaties, customary international law, commitments made to the European Parliament and to United States' and to victims / successors related to (i) restitution and disgorgement of looted art to claimants, their successors or to duly designated successors; (ii) passage and implementation of local laws with relaxed standards designed to expedite and assist with restitution; and (iii) providing access to documentation and information through which claims can be made.

8.       The Popper Collection was among the valuable art and other objects that was looted and seized by the Nazi authorities in the Protectorate of Bohemia and Moravia, which was under the control of Nazi Germany, as part of a brutal campaign of genocide directed at Czech Jews during World War II ("WWII") that ultimately resulted in the deaths of more

---

[1]       Klepetář is also Plaintiff's co-owner and is also involved with and a "partner" in Victims. All references in the complaint to Klepetář are intended to be to Plaintiff's co-owner and vice versa.

close to two hundred thousand Jews from the former state of Czechoslovakia.

9.     Today, at least fifty works of art from The Popper Collection are known to be in the wrongful possession of The Czech Republic and its museums, including The National Gallery in Prague ("Defendant NG") and the Museum of Decorative Arts in Prague ("Defendant UPM"), and other entities all of which are agencies or instrumentalities of The Czech Republic. The National Gallery and Museum of Decorative Arts in Prague are collectively referred to throughout this complaint as Czech Museums.

10.     Czech Museums derive significant revenue from these valuable works, which are among prominent pieces in their collections.   Czech Museums, and other state-owned agencies and instrumentalities of The Czech Republic, may also hold other works from The Popper Collection.

11.     Defendants have concealed and continue to conceal, from Plaintiff and/or The Popper Heirs, access to documentation including three reports commissioned or prepared by one of more of Defendants' agencies or entities or expert groups, between 1998 to 2005, which confirmed the existence of stolen pieces from The Popper Collection as being held in Czech Museums.

12.     The Czech Republic did not give its own researchers and experts complete access to all its archives and central registries, which contained records related to The Popper Collection and the stolen pieces discovered held in Czech Museums.

13.     Defendants have also refused or declined to publish any of its reports for the public's review and scrutiny.

14.     Defendants concealment has interfered with the ability of Plaintiff and/or The Popper Heirs to make restitution claims related to the 50 paintings from The Popper

Collection which are admitted to be in the possession of Czech Museums or to obtain documents through which Plaintiff and The Popper Heirs can trace, locate and secure restitution of The Missing 80 + Paintings and the other objets d'art.

15.    The Czech Republic and Czech Museums have sought to hide behind fascist, Communist-era laws, as well as certain other recent discriminatory acts, and has made knowing and false representations to United States representatives and to other foreign nations and nationals, in an attempt to justify their continued possession of, and failure to restitute, The Popper Collection to the Popper Heirs and successors.

16.    The Nazi authorities in The Protectorate, from whom The Czech Republic and Czech Museums received The Popper Collection, deliberately orchestrated a malicious campaign of genocide perpetrated within the former Czechoslovakia during WWII.

17.    After the end of the World War II, and the dissolution of The Protectorate, the Third Republic of Czechoslovakia came into existence and its president Eduard Benes immediately enacted certain acts, known as the Benes Decrees, including Decrees No. 5/1945 and Act 128/1946, that declared null and void property transactions effected under pressure of the occupation regime on the basis of racial or political persecution, which laws reversed the forced transfer of title to The Popper Collection and obligated the immediate return of The Popper Collection.

18.    As early as 1947 and 1950, Popper Heirs lodged claims for the restitution of The Popper Collection, in accordance with The Benes Decrees.[2]

19.    After the dissolution of the former states, and the 1989 creation of the

---

[2]    From 1945 – 1948, the Third Republic of Czechoslovakia existed and was relatively democratic.  From May 1948 the area now known as The Czech Republic, was the Czechoslovak Republic had become a satellite nation of the former Soviet Union under the rule of the Communist party.  From 1960 to 1989, the area now known as The Czech Republic was called "The Czechoslovak Socialist Republic".

4

democratic states of The Czech and Slovak Federal Republic and later The Czech Republic, certain Czech nationals have as legal successors stepped into the rights of Popper heritage. They have after court proceeding taking almost 20 years succeeded in restitution of Popper real estate in Brno. However, their claims made in The Czech Republic for the restitution of The Popper Collection have been unsuccessful based on the final decision delivered by the Czech Constitutional Court in May 2009.

20.     The claims were unsuccessful in part because of discrimination against certain claims – such as claims to The Popper Collection - and certain types of claimants such as Plaintiffs and The Popper Heirs.  The discrimination results in part by The Czech Republic's desire to continue to wrongfully withhold the property so that the remaining Popper heirs in The Czech Republic all die off and so that they can continue to wrongfully withhold and profit from The Popper Collection.

21.     To accomplish these unlawful purposes and since its creation, The Czech Republic has refused to comply with international laws and representations to The United Nations, The European Union and United States (with whom The Czech Republic has ongoing commercial relations), including violations of (i) Inter-Allied Declaration against Acts of Dispossession committed in Territories under Enemy Occupation and Control, London 5 January 1943 (ii) Final Act of the United Nations Monetary and Financial Conference, Bretton Woods, New Hampshire, 1-22 July 1944, Enemy Assets and Looted Property; (iii) 1998 Washington Principles with respect to Nazi-Confiscated Art; (iv) Resolution 1205 of the Parliamentary Assembly of the Council of Europe of November 1999; (v) Declaration of October 2000 of the Vilnius International Forum on Holocaust Era Looted Cultural Assets; (vi) European Parliament Resolution and Report of Committee on Legal Affairs and the Internal

5

Market November 2003; (vii) Joint Declaration of the European Commission and Czech EU Presidency, 29 June 2009; (viii) Terezin Declaration 30 June 2009; and (ix) Resolution 41 of the General Conference of UNESCO, regarding Declaration of Principles Relating to Cultural Objects Displaced in Connection with the Second World War, 6 October – 23 October 2010.

22.     Contrary to its laws, express representations, commitments and international obligations, The Czech Republic did not (i) promote, enact and implement laws that would permit restitution of The Popper Collection; (ii) investigate and work toward meaningful restitution of The Popper Collection; (iii) publish the materials and reports it developed regarding The Popper Collection (both in Czech Museums and The Missing 84 paintings); (iv) enact laws that were flexible and just in the resolution of claims for restitution of The Popper Collection; and (v) promote equitable disgorgement and/or sale of The Popper collection with proceeds benefiting Popper Heirs and other victims of the Holocaust and Jewish communities.

23.     In 1998, in preparation for The 1998 Washington Conference on Holocaust Looted Property and Art, The Czech Republic established a Joint Working Commission Czech Government pursuant to Resolution Republic of 25 November 1998 No. 773rd which commissioned a report on the fate of property looted by the Nazis, Sudetenland and Protectorate authorities during the period 1938 – 1945.

24.     The Report was entitled  *"Artifacts from Jewish property In The Czech Lands 1938-1945. - Unlawful interference with property rights, their scope and outline of the subsequent fate this property. The report of the expert team to clarify the historical and economic issues Aryanization Jewish property"*.   The Report was completed and presented to The Czech Republic in 2000 *("The 2000 Report")*.

25.     As a result of The 2000 Report, by 1998/2000, The Czech Republic identified

6

some pieces of The Popper Collection on *http://www.restitution-art.cz/ and* therefore knew for a fact that it was in possession of and had been profiting from at least 50 valuable pieces from The Popper Collection and other evidence related to The Missing 80 + Paintings.

26.     Instead of providing a copy of The 2000 Report to The Popper Heirs, The Czech Republic and Czech Museums sought to conceal from them and from the public, the report and all evidence in the 2000 Report which included references to The Popper Collection and other looted artwork that The Czech Republic and Czech Museums continue to withhold from their rightful heirs, victims and/or successors.

27.     After Defendants knew and concealed the unpublished results of The 2000 Report related to The Popper Collection and in a further effort to deprive The Popper heirs of their rights, The Czech Republic declared that certain pieces of The Popper Collection were "national treasures important to the Czech culture" and would not be returned and would not be permitted to leave The Czech Republic.

28.     Shortly after the facts in The 2000 Report was completed, The Czech Republic enacted Act No. 212/2000 Coll. (commonly known as "Holocaust Law of 2000"), which was supposed to make it easier for the remaining heirs to persons killed in the Holocaust to make claims for restitution of their looted property and looted art. [3]

29.     However, The Holocaust Act of 2000 was in direct conflict with (and did not reverse or rescind) (i) Presidential Decrees No. 5/1945 and Act 128/1946 Coll. ("The Benes Decrees") reversing the Nazi's prior forced property transfers due to ethnic or racial or religion as null and void), (ii) Act No. 87/1991 Coll. subsequently amended by Act No. 116/1994 Coll.

---

[3]     In pertinent part, the Holocaust Act of 2000 provided at *§ 1 (2) (Looted) Assets (such as The Popper Collection) in state-owned institutions, listed in the Annex to this Act, shall be transferred free of charge to the ownership of the Jewish Museum in Prague within 30 days from the effective date of this Act . . . § 2 (1) By June 2002, The Federation of Jewish Communities in The Czech Republic, shall submit to the Government a list of things according to § 1, paragraph 1, which it determines are to be transferred.*

(the "Czech General Restitution laws") all of which recognized claims for restitution of The

Popper collection and other restitution claims by The Popper Heirs.   Furthermore, Defendants'

own experts and researchers involved with restitution of art recognized that The Holocaust Law

of 2000 was too restrictive and that many efforts of the only remaining family members to those

who were killed in the Holocaust, Holocaust survivors or their descendants, to secure restitution

of stolen property would be impossible proved futile.[4]

30.    While other claimants with the same standing as The Popper Heirs were able to

recover looted artwork in the possession of The Czech Republic and Czech Museums, The

Popper Heirs were not and The Popper Heirs were discriminated against by the provisions of The

Holocaust Act of 2000 and their rights have been actively interfered with by Defendants and

others in The Czech Republic.

31.    In 2004, when The Czech Republic joined the European Union, it reaffirmed the

validity of The Benes Decrees, including Decrees No. 5/1945 and Act 128/1946 (reversing the

Nazi's prior forced property transfers due to ethnic or racial or religion as null and void), and

demanded these decrees be accepted and honored by the European Union and the world.

32.    In 2004, 2007 and 2010, the Czech Regional Court and Court of Appeals in Brno

found that Michal Klepetář, Plaintiff's co-owner and Predecessors, qualified as an heir to

Richard and Regina Popper under The 1945 Benes Decrees and The 1991/4 Czech General

Restitution Law and as such he was entitled to recover much of The Popper's real property.   The

Czech Supreme Court by decision of January 2007 directed disgorgement of The Popper

Collection.   However, The Czech Republic and Czech Museums have refused to permit the

---

[4]    "There is but a small number of cases where it is possible to surrender an object of art in accordance with
the wording of Act No. 212/2000 Coll. to direct descendents, ie. spouses or children, not proper testamentary heirs
as was the case in1945.  See statement of Helena Koenigsmarkov. Museum of Decorative Arts, Prague. *See
Proceedings of The 2009 Prague Conference on Holocaust Era Restitution.*

8

restitution of The Popper Collection, in direct violation of The 1945 Benes Decrees, The 1991/4 Czech General Restitution Law and other decisions of Czech Courts, and they have refused to restitute The Popper Collection.

33.   From 1998 to 2010, The Czech Republic entered into or reaffirmed treaties, resolutions and agreements with the US and provided assurances to the US that The Czech Republic would swiftly and equitably enacted legislation that would make it easier for victims and heirs (such as The Popper Heirs) would recover looted property and artwork. [5]

34.   The Czech Republic made material representations to US public officials about their intentions regarding restitution and the direct affect that The Czech Republic's efforts would have for survivors, including persons in the United States and in Florida.[6]  However, those

---

[5]   These treaties, declarations, resolutions and representations were made at the 1998 Washington Conference, The 2000 Vilnius Conference and the 2009 Prague Conference directly to US State Department representatives involved with restitution issues from 1996 to the present.  These representations, declarations, resolutions and representations – and the failure to implement them in relation to The Popper Collection – are part of the public record of the US Congress and contained at *See Congressional Record July 8, 2009 Page S7226 - http://www.gpo.gov/fdsys/pkg/CREC-2009-07-08/pdf/CREC-2009-07-08-pt1-PgS7226.pdf#page=1.*

[6]   During the period from 1998 to 2009, The Czech Republic made these representations to US Ambassador Stuart Eizenstat, US Ambassador J.D. Bindenagel and others.  And, the Eastern European countries, including The Czech Republic, have not honored its promises under The 1998 Washington Principles.   See Opening Statement of Ambassadors Eizenstat and Bindenagel at the opening of the 2009 Prague Conference on Holocaust Era Restitution. "the promises made in Washington in 1998 to bring a measure of justice to the victims that the principles brought remain unfulfilled" *See http://www.commartrecovery.org/sites/default/files/docs/events/bindenagel.pdf.*  In 2009, the United States sent more than twenty five representatives to The Holocaust Era Assets Conference Prague – June 6 – 9, 2009, including Ambassador Stuart E. Eizenstat, Head of Delegation; Ambassador J. Christian Kennedy, Special Envoy for Holocaust Issues; Professor Elie Wiesel, author, Holocaust Survivor; Mary Thompson-Jones, Charge d'Affaires, American Embassy, Prague; Rep. Robert Wexler (D-FL) ; Lynn Nicholas, author of The Rape of Europa; Nancy Yeide, Head of the Department of Curatorial Records, National Gallery of Art; Menachem Rosensaft, General Counsel, World Jewish Congress; Owen Pell, attorney, White & Case; Sara Bloomfield, Director, U.S. Holocaust Memorial Museum; Anna Rubin, Director, New York State Holocaust Processing Office; Esther Finder, President, Generation After; Saul Kagan, Conference on Jewish Material Claims against Germany, Holocaust Survivor; Alex Moskovic, Holocaust Survivor (Florida); Abraham Biderman, Chairman, Eagle Advisers, L.L.C.;Benjamin Ringel, President, Armstrong Capital; Ann F. Lewis, Board member, Jewish Women's Archive; Susan Sher, Assistant to President Obama and Chief of Staff to the First Lady Michelle Obama; Danielle Borrin, Special Assistant, Office of the Vice President; Office of Holocaust Issues staff, US Department of State; Elizabeth Nakian; John P. Becker; Gregory Mattson;  Basil Scarlis and Brittney Bolin.  According to Rep. Wexler, Wexler: I am here because I am concerned *about the "urgent issues of importance, such as property restitution, the collection of Nazi-looted art, and there's a very limited window of opportunity to help Holocaust survivors in their waning years . . . this conference represents the last best hope to address the needs of Holocaust survivors, particularly in the context of the number of Holocaust survivors in America, internationally, who are in a condition of poverty."*

representations have yet to be honored.

35.    The Czech Republic's process of dealing with restitution has not been transparent and it has failed to take the actions regarding restitution to make it easier for claims to be made and for restitution to be achieved that it committed and represented to the US it would take.[7]

36.    In 2009, The Czech Republic convened an international Conference entitled "Holocaust Era Assets Conference" ("The 2009 Prague Conference") whose objectives were, among other things, (i) to assess progress made since The 1998 Washington Conference on Holocaust Era Assets in the areas of recovery of looted art and objects of cultural, historical and religious value (according to The 1998 Washington Conference Principles on Nazi-Confiscated Art and the Vilnius Forum Declaration 2000) and property restitution and financial compensation schemes and (ii) to review current practices regarding provenance research and restitution and, where needed, define new effective instruments to improve these efforts. " *See statement of Ambassador Miloš Pojar, the Chairman of the Organizing Committee, Prague"*

*http://www.holocausteraassets.eu/*

37.    In 2009, The Czech Republic convinced the United States to pay it $750,000 ($150,000 per year) to help fund an institute to be known as The European Shoah Legacy

---

*See* http://hsf-See. usa.blogspot.com/2009/06/wexler-comments.html

[7]    " 'There is but a small number of cases where it is possible to surrender an object of art in accordance with the wording of Act No. 212/2000 Coll. to direct descendents, ie. spouses or children, not proper testamentary heirs as was the case in1945' ".See statement of Helena Koenigsmarkov, Museum of Decorative Arts, Prague. " 'We had hoped and believed that (prior) compromises in draft declaration adopted in Paris would be taken into account by politicians during discussions on the Terezin Declaration. This did not happen, however. Our hopes that a vision for the future would be agreed upon were perhaps most succinctly formulated by Uwe Hartmann in a completely different context in the spring of this year when he said: After the 1998 Washington Declaration, they said: Now we're going to get started. Ten years later, they were still saying: Now we're really going to get started.  In its own way, like the task force for the creation of an international database of looted art, the effort to establish an international association of institutions and experts in the field of looted art turned out to be futile. Simply as an aside, I should mention that at one of our working lunches I asked an important politician (who was not Czech) the following question: What would politicians have done without us "experts"? What would they be discussing today after ten years? The question remained unanswered . . .  At times, during the tempestuous and passionate discussions about our expert declaration, and even more so during negotiations.' "See Statement of Helena Krejcova, Dirctor of Documentation Centre. See Proceedings of 2009 Holocaust Era Assets Conference.

Institute ("ESLI") that was to be and was in fact established as an organ of The Czech Republic. Government and was to be dedicated to fulfilling, among other things, (i) research and publication of experts' reports related to looted art, (ii) helping to create and implement programs for restitution of looted art with relaxes standards for making claims so that restitution could be made and (iii) in cases where restitution could not be made because no heirs were found, helping to create and implement mechanisms through which looted art was to be disgorged from the institutions where it was held and given to survivor organizations or other methods would be established to honor those from whom it was stolen. However, despite its 2009 representations to the US, UK and other governments, after its reaffirmation of the 1998 Washington Principles, and after asking the US to pay 1/3 of the operating costs of ESLI, the Czech Government failed and/or has yet to fulfill its commitments. [8]

38.     Prior to the filing of this lawsuit, Plaintiff demanded (i) production of The 2000 Report and any and all documents and reports related to The Popper Collection; (ii) permission to inspect, photograph and videograph the portions of The Popper Collection in the custody, possession or control of The Czech Republic and Czech Museums; and (iii) cooperation with the relatives, descendants, heirs, successors and persons with interest to The Popper Collection, in efforts (a) to secure The Popper Collection until restitution is made of those pieces in the custody, possession or control of The Czech Republic and Czech Museums and (b) to locate the missing pieces of The Popper Collection so that restitution can be made of those pieces that are not in the custody, possession or control of The Czech Republic and Czech Museums. The

---

[8]     US State Department Special Envoy for Holocaust Issues in a Feb. 2010 interview with Czech Press Agency said the activities of European Shoah Legacy Institute are not very visible in the USA and while the United States had previously pledged a contribution of USD 750 000 to the Institute, Davidson acknowledged the US government had delayed sending the initial portion of those funds. *See* http://www.romea.cz/english/index.php?detail=2007_2123&id=detail *and "UK dissatisfied . . . ESLI "doing nothing for claimants" http://www.thejc.com/news/world-news/50721/restitution-body-doing-nothing-claimants*

Czech Republic and Czech Museums have refused the request.

39.     Prior to filing of this lawsuit, Plaintiff and/or its predecessors, demanded the return of The Popper Collection, however The Czech Republic and Czech Museums refused.

40.     None of the acts taken or relied upon by The Czech Republic and Czech Museums ever voided the Popper Heirs and their successors' ownership rights to The Popper Collection.   Because The Czech Republic and Czech Museums never acquired more than a custodial interest in the works they have so desperately sought to retain, in the face of the clear demand by Plaintiff and/or its predecessors there is simply no excuse for their (i) failure to return The Popper Collection, (ii) concealment and refusal to provide copies of official Czech reports including The 2000 Report and other art confiscated by the Nazis and which remains in the custody of The Czech Republic, (iii) refusal to cooperate in the accounting, documentation, preservation and publication of all artwork in their custody and which was stolen from victims of the Nazi Regime and (iv) refusal to disgorge all artwork – including The Popper Collection – that they continue to withhold from victims of the Nazi regime, their heirs and successors.

41.     The Czech Republic and Czech Museums have actively sought to promote Czech culture and tourism in the United States, including through festivals of Czech art and culture conducted at venues throughout the United States, including in this District. Conspicuously absent from these festivities were the tainted works of art from The Popper Collection and other looted art from victims of Nazi Persecution over which Defendants maintain their wrongful possession.

42.     The Czech Republic and Czech Museums have unlawfully profited from the fruits of illegal acts of genocide for more than sixty-five years.  The Popper Heirs and their

12

successors, including Plaintiff, are entitled to full and complete accounting and restitution of all of the pieces of The Popper Collection that are currently in the possession of The Czech Republic and Czech Museums  as well as to any additional pieces from The Popper Collection that may subsequently be returned to Czech Republic from Austria, Germany, Russia, or elsewhere.

43.     Plaintiff and The Popper Heirs are entitled to a fair compensation for lost profits concerning The Popper Collection, its exhibition and / or potential sale of individual artworks.

## THE PARTIES

44.     Plaintiff Victims of Holocaust Art Theft ("VICTIMS") [9] is a business registered in Florida and in this judicial district, is an owner of certain interests in The Popper Collection, is a limited partner with and has limited but express authority Michal Klepetář, one of The Popper Heirs [10] and to take certain acts regarding The Popper Collection, including commencing this action.

45.     Defendant CZECH REPUBLIC is a foreign state as defined in 28 U.S.C. § 1603(a).

46.     Defendant NÁRODNÍ GALERIE V PRAZE - NATIONAL GALLERY IN PRAGUE (the "NG") is an art museum located in Prague, Czech Republic, with an address at Kinsky Palace (General Headquarters), Staroměstské nám. 12, 110 15 Prague 1. Czech

---

[9]     Registration of "Victims of Holocaust Art Theft" was made through www.sunbiz.org. Victims of Holocaust Art Theft is the result of agreements, cooperation and partnering between / of Edward D. Fagan and Michal Klepetář from The Czech Republic (for The Popper Collection) and other persons with similar claims for restitution / replevin of art work originating in other Eastern European countries.

[10]     The representative and spokesperson for The Popper Heirs is Michal Klepetář who is the great – nephew of Richard and Regina Popper – the original owners of the stolen art that is the subject of this complaint. Michal Klepetář is a Czech national and has been fighting to recover The Popper Collection since 2000

13

Republic.   Upon information and belief, NG was established in 1949 and collects, records, maintains (on a permanent basis), professionally processes and makes publicly accessible, art works of painting, sculpture and graphic art, including art that was stolen from victims of the Holocaust, including pieces of The Popper Collection.

47.     DEFENDANT UMĚLECKOPRŮMYSLOVÉ MUSEUM V PRAZE - MUSEUM OF DECORATIVE ARTS IN PRAGUE ("UPM") is an agency of Defendant CZECH REPUBLIC located in 17. listopadu 2, 110 00 Prague 1, Czech Republic

48.     Defendant NG and Defendant UPM are referred to hereinafter collectively as "Czech Museums".

49.     Upon information and belief, at all relevant times, Czech Museums were agencies or instrumentalities of The Czech Republic, as defined in 28 U.S.C. ß 1603(b), owned and operated by predecessors to The Czech Republic (during the Communist era or the Czechoslovak Socialist Republic or The Czech and Slovak Federal Republic).

**THE ARTWORKS AT ISSUE**

50.     Upon information and belief, at least fifty pieces of art "hereinafter "The Stolen Art") [11], including paintings by Dutch, Flemish, German and Austrian masters and

---

[11]     As explained below, upon information and belief, there are three experts reports commissioned by Defendant Czech Republic (and conducted by Defendant Czech Museums or by Centrum pro dokumentaci majetkových převodů kulturních statků obětí II. světové války – Documentation Centre of Property Transfers of Cultural Assets of WW II Victims an institution of the Czech Academy of Science (the "Documentation Centre") between 1998 to 2005.

- The first report is from 1998 – 2000 and is entitled "The report of the expert team to clarify the historical and economic issues Aryanization Jewish property established in the Joint Working Commission Czech Government Resolution Republic of 25 November 1998 No. 773[rd]" ("The 2000 Report") and it identified 43 paintings in Defendants possession.    This report identified 43 stolen paintings from The Popper Collection being held at the Gallery.
- The second report is from 2001 and was by Drs. Heleně Krejčové and Václavu Erbenovi of Defendant's Center for Documentation of Property Transfers of Cultural Assets of Victims II. World War II based on The 2000 Report, the documentation from Defendant Gallery and other of Defendant's archives. This report identified 43 stolen paintings from The Popper Collection being held at the Gallery.
- The third report is from May 2005, and was prepared by the Documentation Center as part of its ongoing research into property restitution by Centerm na půdě AV ČR (26. 5. 2005).  In this report, Dr. Václavu

ornate clocks, from The Popper Collection are currently in the possession of Defendant Czech Museum, which are agencies or instrumentalities of Defendant Czech Republic.

51.     Certain pieces of The Stolen Art from The Popper Collection belonging to Plaintiff and The Popper Heirs are currently in the possession, custody or control of Defendants Czech Republic and Czech Museums.

52.     Certain pieces of The Stolen Art from The Popper Collection belonging to Plaintiff and The Popper Heirs are currently in the possession, custody or control of Defendants Czech Republic and Czech Museums.

53.     Partial lists or listings of the stolen art from The Popper Collection are attached hereto and incorporated herein as Exhibits 1 & 2 and the art that Defendants admit they have in their possession are attached hereto and incorporated herein as Exhibits 3 & 4. [12]

54.     Upon information and belief, the value of the artworks from The Popper Collection presently in the unlawful possession of the Defendants Czech Republic and Czech Museums exceed S 50 million.

## JURISDICTION & VENUE

55.     This Court possesses subject matter and personal jurisdiction over The Czech Republic and Czech Museums pursuant to 28 U.S.C. § 1330 because these are claims

---

Erbenovi reported that he had expanded his prior work and was able to identify 50 stolen paintings from The Popper Collection in the Gallery.
The experts' team that prepared The 2000 Report, was limited by Defendant Czech Republic in the amount of time they were able to work on the Report and they were not given full access to all archives and central registries in Defendants' possession.  Finally, none of these three reports have been made available to the public and none were given to The Popper Heirs.  *See 1 July 2009 email from Michaela Sidenberg (of Defendant Gallery and member of Expert Team that generated The 2000 Report).*

[12]   The lists are: (i) Exhibit # 1 - 1940 Inventory when the Poppers were first ordered to surrender their artwork, (ii) Exhibit # 2 - 1948 inventory created during the Second Republic, (iii) Exhibit # 3 – printout from Defendant NG's website and Czech Government listing of stolen paintings in their possession, and (iv) Exhibit 4 – printout from Defendant UPM's website showing the Stolen Clock from The Popper Collection in its possession.   Defendants have withheld other lists and documents that they prepared and relied upon to concluded that these pieces that in their possession were stolen from Richard and Regina Popper.

15

as to which no defendant is entitled to immunity under 28 U.S.C. §§ 1605-1607 (the Foreign Sovereign Immunities Act ("FSIA")). Process will be served on Defendants pursuant to 28 U.S.C. § 1608.   Venue is proper in this District under 28 U.S.C. §§ 1391(f)(3) and (f)(4).

### Defendants Are Not Immune From Suit Pursuant to 28 U.S.C. § 1605(a)(3)

56.     Under 28 U.S.C. §§ 1603(a) and 1605(a)(3), a foreign state (including an agency or instrumentality thereof) shall not be immune from suit in any case "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is ... owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

57.     Acts of genocide violate international law.

58.     The 1948 Convention on the Prevention and Punishment of the Crime of Genocide (which both Czech Republic and the U.S. have ratified) confirmed "genocide, whether committed in time of peace or in time of war, is a crime under international law." Under international law, genocide includes the taking of property from a persecuted group.

59.     War crimes and crimes against humanity violate international law.

60.     Under the Nuremberg Charter, "war crimes" were defined to include "plunder of public or private property." Likewise, "crimes against humanity" were defined to include  "persecutions on political, racial or religious grounds in the execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated."

61.     The Nazi Regime and The Protectorate authorities (predecessors in possession to Defendants Czech Republic and Czech Museums) directed and actively

16

engaged in the genocide that was perpetuated against The Protectorate (formerly Czechoslovakian) Jews, including The Popper family and its property, and specifically The Popper Collection.

62.     This action concerns rights in property – specifically over 125 pieces of art known as The Popper Collection - that were wrongfully taken from the Richard and Regina Popper and then The Popper Heirs in violation of international law by The Protectorate government and their Nazi superiors and the local Czech officials.   The seizure of art owned by Jews, including The Popper Collection, constituted acts of genocide against The Protectorate (formerly Czechoslovakian) Jews.   It also constituted a war crime and crime against humanity.

63.     The seizure of The Popper Collection violated customary international and treaty law actionable in this Court as federal common law and the law of nations as evidenced by various sources including but not limited to: the Hague Convention of 1907, the Declaration of London concerning Forced Transfers of Property in Enemy-Controlled Territory, the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, and the Nuremberg Charter.

64.     The seizure of the Popper Collection also violated international law because it was discriminatory and without just compensation.

65.     Ownership rights to The Popper Collection remained at all times with The Popper Heirs.

66      Upon information and belief, Defendants The Czech Republic and Czech Museums are each engaged in commercial activity in and with the United States and directed commercial activities at U.S. citizens, including citizens of the Southern District

17

of Florida. Among other things:

    a.   Conduct and promotion of tourism, membership and printing/sales of catalogues for museums, *See http://www.ngprague.cz/en/116/sekce/friends-of-the-ng/ and http://www.ngprague.cz/en/14/sekce/publishing-house/* ;

    b.   Participation in workshops, seminars and meetings in the US, *See http://www.moma.org/learn/intnlprograms/workshops/workshop_europe* ;

    c.   Revenue producing loans / exchanges of art pieces and collections, *See http://www.moma.org/docs/press_archives/5827/releases/MOMA_1980_0030_33.pdf?2010, http://www.moma.org/search?query=National+Gallery+in+Prague&page=1, http://www.moma.org/docs/learn/icelist.pdf, http://www.metmuseum.org/Collections/search-the-collections/110003097, and http://www.metmuseum.org/Collections/search-the-collections/110001612* ;

    d.   Soliciting artists and art from the US, including Florida, *See http://news.google.com/newspapers?nid=1755&dat=20041126&id=uvAeAAAAIBAJ&sjid=_4MEAAAAIBAJ&pg=6273,911927; http://www.marjorieminkin.com/exhibitions.html , http://www.google.com/#q=%22National+Gallery+in+Prague%22+and+%22New+York%22&hl=en&prmd=imvns&ei=aQaCT57WNsSatwff7JipBg&start=10&sa=N&bav=on.2,or.r_gc.r_pw.r_qf.,cf.osb&fp=f85e188e4be29462&biw=1333&bih=645;*

    e.   Work with companies, professionals and foundations; *See - http://www.lansing-dreiden.com/ldgi/index.htm and http://baruchfoundation.org/pages/anderle*;

    f.   Promotion and Internet Tickets sales; *See http://www.marys.cz/prague_guide/galleries/ ; http://www.praguetoursdirect.com/events-culture/art-exhibitions-and-galleries-in-prague.htm; http://www.pragueeventscalendar.com/en/places/national-gallery-59/* ;

18

g. Sales of books on line, *See*

*http://books.google.com/books?id=vX3qAAAAMAAJ&source=gbs_similarbooks,*

*http://www.barnesandnoble.com/s/-National-Gallery-in-Prague-*

*?store=book&keyword=%22National+Gallery+in+Prague%22,*

*http://www.amazon.com/s/ref=nb_sb_noss?url=search-alias%3Dstripbooks&field-*

*keywords=%22National+Gallery+in+Prague%22;*

h. Solicitation of Advertisements, *See*

*http://erasmusorgasmusprague.wordpress.com/2010/10/14/monet-warhol-exhibition-in-*

*the-national-gallery-in-prague/;*

i. Promotion of Tourism including Defendant Museums, *See*

*http://www.czechtourism.com/Foreign-branches.aspx;*

j. Retention of Lobbyists for Czech institutions or programs (including ESLI), *See*

*http://soprweb.senate.gov/index.cfm?event=getFilingDetails&filingID=7E460CDA-*

*9E23-4B73-90B4-2A2EEFEE1436;*

k. Lending of Holocaust Art Exhibitions commissioned by Czech Government

traveled to tour the US from Nov. 2009 to Oct. 2010, *See*

*http://www.flickr.com/photos/38020424@N04/sets/72157619294901021/;*

l. Promotion of Film Festivals, *See*

*http://www.bulletfilm.com/festivals/search?country=47;*

m. Cooperation, partnerships, scholarship, tuition and assistance for students from

US Universities, including University of Florida and Florida State University, *See*

*http://www.mzv.cz/washington/en/culture_events/education/czech_studies_in_the_u_s/cze*

*ch_u_s_college_partnerships.html, http://www.fulbright.cz/cooperation-czech-*

*universities, http://unva.cz/;*

19

n.  And other similar commercial activities.

67.     Defendant Czech Republic is also engaged in commercial activities in and with the United States, and in the Southern District of Florida in particular. Among other things: it maintains an Embassy in the District of Columbia, as well as consulates in New York and Los Angeles and Miami, each of which are involved in and host events serving to promote Czech cultural and business interests in the United States.

68.     The Czech National Tourist Office, owned and controlled by Czech Republic with an office in New York, New York, conducts advertising campaigns promoting tourism to Czech Republic throughout the United States, including in the Southern District of Florida.  As described above, the website www.czechtourism.com expressly promotes tourism by referring to the works of art in Czech Museums. Upon information and belief, Defendants Czech Republic and Czech Museums receives millions of dollars in revenue each year from U.S. tourists.

### Alternatively, Defendants Are Not Immune From Suit
### Pursuant to 28 U.S.C. § 1605(a)(2)

69.     Under 28 U.S.C. §§1603(a) and 1605(a)(2), a foreign state (including an agency or instrumentality thereof) shall not be immune from suit in any case "in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

70.     In the years immediately following WWII, Defendant Czech Museums, acting at the directions of Defendant Czech Republic (or its / their predecessors) , became custodians of artworks that had either been looted or stored during the war or stored, or that were returned to from abroad.  Defendants Czech Republic and Czech Museums knew at all

20

relevant times that some of the art included The Popper Collection, which came from Richard and Regina Popper who were killed in the Holocaust, and that the Popper Heirs owned the rights to The Popper Collection.

71.     From 1998 to 2009, Defendants Czech Republic and Czech Museums made certain representations and/or misrepresentations to US Ambassadors, members of Congress, Special Envoys and others related to restitution and in particular looted art claims, including The Popper Collection, and those representations and misrepresentations caused a direct effect in the United States.

### 1938 – 1945 PERSECUTION, GENOCIDE AND EXPROPRIATION IN THE REICH PROTECTORATE OF BOHEMIA AND MORAVIA [13]

72.     By October 1938, the Czech Border regions were annexed and occupied by Nazi troops. The occupied territory was formerly known as The Reich Protectorate of Bohemia and Moravia ("The Protectorate").

73.     In 1941, after its annexation, The 1935 Nuremberg Laws of 1935 were extended to The Protectorate and made retroactive to March 1935.

74.     The Nuremberg Laws introduced the "racial" definition of Jewry, whereby the Jewish "race" was defined not only by the present or previous adherence of any person to the Jewish religion but, in addition, by the present or previous Jewish religion of his or her parents or grandparents, and/or his or her spouse.

75.     The Nuremberg Laws, are contained in 1939 Reichsgesetzblatt, Part I, page 282 and in 1941 Reichsgesetzblatt, Part I, page 722, and as follows:

- Jewish immigrants were denaturalized (1933 Reichsgesetzblatt, Part I, page 480);
- Native Jews were precluded from citizenship (1935 Reichsgesetzblatt, Part I, page 1146);

---

[13]     The following historical accounts are reported in the 1999 book entitled The Phenomenon Holocaust Project. See http://old.hrad.cz/president/Havel/holocaust/index_uk.html

- Jews were forbidden to live in marriage or to have extramarital relations with persons of German blood (1935 Reichsgesetzblatt, Part I, page 1146);
- Jews were denied the right to vote (1936 Reichsgesetzblatt, Part I, page 133);
- Jews were denied the right to hold public office or civil service positions (1933 Reichsgesetzblatt, Part I, page 277);
- Jews were relegated to an inferior status by the denial of common privileges and freedoms. They were denied access to certain city areas, sidewalks, transportation, places of amusement, restaurants (1938 Reichsgesetzblatt, Part I, page 1676).
- Progressively, more and more stringent measures were applied, even to the denial of private pursuits. They were excluded from the practice of dentistry (1939 Reichsgesetzblatt, Part I, page 47);
- The practice of law was denied to them (1938 Reichsgesetzblatt, Part I, page 1403);
- The practice of medicine was forbidden them (1938 Reichsgesetzblatt, Part I, page 969);
- They were denied employment by press and radio (1933 Reichsgesetzblatt, Part I, page 661);
- They were excluded from stock exchanges and stock brokerage 1934 Reichsgesetzblatt, Part I, page 661);
- They were excluded from farming (1933 Reichsgesetzblatt, , Part I, page 685);
- They were also forced to pay discriminatory taxes and huge atonement fines. Their homes, bank accounts, real estate, and intangibles were expropriated; and
- As of 1943, the Jews were placed beyond the protection of any judicial process and the police were made the sole arbiters of punishment and death (1943 Reichsgesetzblatt, Part I, page 372).

> *See A Teacher's Guide to the Holocaust, produced by The Florida Center for Instructional Technology, College of Education, University of South Florida. http://fcit.usf.edu/holocaust/people/DocDec.htm*

76.     According to the last prewar census in Czechoslovakia in 1930, 76,301 inhabitants of Bohemia and 41,250 of Moravia and Silesia were identified as Jews. Of these 117,551, approximately 43,000+ were recorded as having Czech nationality and 37,000+ as having Jewish nationality, 35,000 + as German nationality and the rest other nationalities.

22

77.     After the annexation of The Protectorate, a wave of terror was unleashed on the Jewish inhabitants, including The Poppers.

78.     Concentration camps and jails were established, synagogues were burned and Jewish citizens, including The Poppers, were forced into Ghettos, awaiting deportations.

79.     On 30th January 1939, Adolf Hitler announced to the world that Nazi Germany the potential "annihilation of the Jewish race in Europe.

80.     On January 21, 1939, Hitler had received the then Czechoslovak Minister of Foreign Affairs, and informed him of the "Jewish problem" and explained that "The Jews in (Germany) shall be exterminated" and this would be the example of how to "solve the Jewish problem" in Czechoslovakia.

81.     The Nazi Regime's policy toward Jews in The Protectorate was to exclude Jews from the economy and in cooperation with the occupation administrative, economic and police authorities, banks and industrial concerns, to strip Jews of the protections of citizenship, strip them of their nationalities and take their property.

82.     During the first years of the Protectorate the German occupation authorities attempted to reduce the number of Jews as radically as possible through deportation, systematic discrimination and terrorist measures, and forced transfers of property.

83.     From 1939 to 1940, persecutions and forced property transfers were continued.

84.     The forced property transfers and thefts of artwork helped the Nazis, the Sudetenland and Reich Protectorate of Bohemia and Moravia fund their campaign of genocide against the Jews, including Richard and Regina Popper.

85.     On September 16, Heinrich Himmler, head of the Reich's SS and Chief of the German police, announced that:  "The Fuhrer wishes the old Reich and the Protectorate from

West to East to be cleared of and liberated from the Jews as soon as possible (and) to transport the Jews of the Old Reich and the Protectorate first to the eastern territory, which two years ago became part of the new Reich, if possible by the end of this year, and to remove them next spring farther to the East."

86.    As of the October 1, 1940 census of all persons subject to the Nuremberg Laws took place in the Protectorate, 88,105 persons were counted.

87.    At a meeting in Prague on October 11, 1940, Heydrich announced the evacuation of Czech Jews into the region where "Jews in general" were to be exterminated and that the first 5 000 Jews will be evacuated to the east after October 15, via Litzmannstadt (Lodz)."

88.    From 1940 to 1941, the Jews from The Protectorate were expelled from their homes and sent to their deaths in the Lodz Ghetto [14], the gas chambers in Chelmno, Majdanek and Auschwitz or they became slave laborers who were worked to death.

89.    At the Wannsee conference of 1942, Heydrich proposed using Terezin as part of the strategy of the final stage of the "final solution", as a concentration and transit camp, as a tool of decimation and also as a means of disinformation on the fate of deported Jewish inhabitants.

90.    The history of the fate of the Jews in the Protectorate is as follows:

- On the eve of the German occupation, 118,310 Jews lived in (The Protectorate).
- Immediately after the occupation, a wave of arrests began, mostly of refugees from Germany, Czech public figures, and Jews.
- Fascist organizations began harassing Jews;
- Synagogues were burnt down;
- Jews were rounded up and attacked in the streets;
- In June 1939, Adolf Eichmann arrived in (The Protectorate and established) the Central Office for Jewish Emigration (Zentralstelle Fuer Juedische

---

[14]      Richard and Regina Popper were on the 4th Transport from Prague to the Lodz Ghetto in October 1941, where exactly according to the Heydrich proclamation, they were exterminated.

24

Auswanderung), to encourage the Jews to leave the country;

- Only 26,629 Jews managed to emigrate, legally or not, before emigration was completely banned in October 1941.

- Also in June 1939, a decree was issued barring Jews in the protectorate from almost all economic activity, and Jewish property was seized;

- Jewish businesses were "bought" by Germans using force and threats;

- In all, the Germans seized about a half-billion dollars worth of Jewish property in The Protectorate;

- After World War II broke out in September 1939; the Jews were immediately subjected to a brutal series of persecutions.

- Jews were fired from their jobs; they were denied certain ration items, such as sugar, tobacco, and clothing; and their freedom of movement was restricted;

- Prominent Jews were taken hostage and sent to concentration camps.

- In October 1939, the first deportation took place: 3,000 Jewish men were exiled to the Lublin area;

- By November 1939, Jewish children had been expelled from their schools and Jewish use of telephones and public transportation had been restricted;

- A Judenrat-like organization was established and called the Jewish Religious Congregation of Prague (JRC). Gradually, the JRC turned into the obedient puppet of the German authorities, charged with responsibilities such as seizing Jewish assets, assigning Jews to do force labor, and helping with the deportations;

- In September 1941, the JRC was ordered to take a census of the Jewish population of The Protectorate. At that time, there were 88,105 people, who were then forced to wear the Jewish badge and live totally separate from the rest of the population (see also badge, Jewish).

- After Heydrich was appointed acting governor of The Protectorate in 1942, he immediately began to persecute the Jews, decided to move all the Jews to Theresienstadt, in the hope that many of them would die there and any remaining Jews would be deported to the east.

- Before sending Jews to Theresienstadt, in 1941 Heydrich first sent five transports

25

of Jews from Prague to Lodz[15] and one transport from Brno to Minsk and Riga. Most of these Jews were ultimately murdered.

- From November 1941 to March 1945, more than 73,000 Jews from The Protectorate were sent to Theresienstadt.
- Between 1942 and 1944 approximately 60,000 of them were sent on to Auschwitz and other extermination camps.
- Only 3,277 survived the war.
- After Czechoslovakia was liberated on May 5, 1945 only 2,803 Jews were left.
- Of the 92,199 Jews living there before the deportations began, 78,154 died during the Holocaust and 14,045 survived.

    *See http://www1.yadvashem.org/odot_pdf/microsoft%20word%20-%206071.pdf.*

### RICHARD AND REGINA POPPER

91.     Richard and Regina Popper ("The Poppers") were wealthy Jews residing in Brno, Moravia.  Richard Popper was general manager of huge coal production facility and mine and over the years he was able to amass considerable wealth, including real estate, artwork and other objets d'art.

92.     The Poppers conducted business in Czechoslovakia and Austria.

93.     They owned significant properties in Brno and were prominent collectors of paintings, Judaica and other objets d'art including carpets, antique clocks, porcelain and glass.

94.     As a result of the imposition of The Nuremburg Laws, Jews living in The Protectorate including the Poppers were stripped of their nationalities, stripped of their citizenship (as Czechoslovakia ceased to exist), stripped of their civil liberties and subjected to acts of genocide and became victims of looting by The Protectorate and local officials who were aiding and abetting the Nazi regime's and The Protectorate's acts of Genocide.

---

[15]     The Poppers were on one of Heydrich's first five transports to Lodz in 1941.

95.     The Poppers were forcibly relocated from Brno to Prague and from there The Poppers were deported to and murdered in Poland.

96.     The Poppers last residence before deportation was listed as Prague, XII; their address/place of registration in the Protectorate was listed as Prague XI, Lucemburská 1 and they were deported expelled from the Protectorate on October 31, 1941, in Transport D to Lodz Poland were they were murdered by the Nazis. [16]

97.     When they were stripped of their rights and property, The Poppers were forced to turn over their collection of paintings, Judaica and other objets d'art including carpets, antique clocks, porcelain and glass.

98.     The full list of assets and property that was expropriated from The Poppers by the Nazis and The Protectorate officials was, has been and continues to be concealed from Plaintiff and The Popper Heirs.  However partial lists are attached hereto and incorporated herein as Exhibits 1 & 2. [17]

### The Looting Of The Popper Collection

99.     The looting of Jewish property, including cultural property, was an integral part of the Holocaust, as established at the Nuremberg trials of the major German war criminals.

100.    The Protectorate government, including the Protectorate state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone "of Jewish origin" of their assets.

---

[16]     *See http://www.holocaust.cz/en/transport/TRANSPORT.ITI.210, p. 5 - Richard & Regina Popper*

[17]     The Popper names were not included in the formal list prepared by Czech Republic entitled *"A list of people whose property was confiscated by the occupation authorities in the territory of the so-called Protectorate"* which was assembled in 1998/1999 and published in October 1999.  See http://old.had.cz/president/Havel/holocaust/index_uk.html

101.    Pursuant to The Nuremberg Laws and Protectorate Decrees, Jews (and non-Jews in possession of Jewish valuables) were required to register all of their property. Based on the registrations, safe deposit boxes rented by Jews were sealed, and the Protectorate government inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews.

102.    The Protectorate government was particularly concerned with the retention of artistic treasures and valuables belonging to Jews.   The Protectorate government issued a specific decree regarding the Recording and Safeguarding of Impounded Art Objects of Jews and established a warehouses, auction houses and collection points, and procedures through which The Protectorate Jews, including The Poppers, were required to register all art objects in their possession, including paintings, statues, carvings, folk art, and decorative art objects (such as carpets, furniture, glass, ceramic or porcelain objects, etc.). These art treasures were sequestered and collected centrally by The Protectorate authorities with the assistance of certain officials in the Jewish community who were assisting them.

103.    Pursuant to further decrees, Protectorate Jews were forcibly removed from their homes and their assets seized.

104.    Richard and Regina Popper delivered their property and artwork as they were ordered to do by The Protectorate government.

## COMPLETE RESTITION OF POPPER REAL PROPERTY
## VERSUS THE FATE THE POPPER COLLECTION - 1940 to 2012

### The Nature of The Popper Estate Subject to Restitution

105.    Richard and Regina Popper owned real estate, apartments buildings, other property, artwork and objets d'art.

28

### The Popper Collection

106.    The Popper Collection was originally located in Brno but was later confiscated and transported to Prague.

107.    At the time of its confiscation, The Popper Collection included 127 paintings by old masters from the 15th to 19 century, paintings of Flemish and Dutch painters of the 17th century, works of Italian authors of the 16th and 17 century, occurred also in the works of French and German origin and works by Austrian Masters from the 15th century.

108.    The lists of the stolen art from The Popper Collection referred to above in ¶ 53, contain a partial inventory of The Popper Collection.

109.    It is known that certain photographs of The Popper Collection existed and are in the possession of Defendants Czech Republic and Czech Museums; however, Defendants Czech Republic and Czech Museums have refused the requests by Plaintiff and/or The Popper Heirs for access to their records to examine and conduct further research.

110.    Defendants Czech Republic and Czech Museums are in possession of multiple lists from during the war and from the post war years that contain descriptions of works in The Popper Collection, as well as some identifications of the artist, dimensions or descriptions of the works and the locations where The Popper Collection was stored after it was seized.

111.    After the Nazis and The Protectorate officials seized The Popper Collection, was catalogued, inventoried, appraised and stored.  However, as was their custom and practice, the appraised or assessed values of seized artwork were listed at a fraction of their true values.

112.    After the end of World War II, the dissolution of The Protectorate and the return of democratic rule in the Third Republic of Czechoslovakia in May 1945, the fate of The Popper Collection remained unknown.

## 1946 Claim for Restitution of Popper Real Property & The Popper Collection

113.    However, in November 1946, Mr. Otto Klepetář, grandfather to Michal Klepetář, representing some of The Popper Heirs, lodged a restitution claim for The Popper Collection.

114.    From 1946 to 1949, the predecessor to The Czech Republic refused to return The Popper Collection.

115.    Instead, they dragged the process out for more than two years demanding that Otto Klepetář produce evidence from the Nazis or the Lodz Ghetto administration to show which Popper (Regina or Richard) was killed first after they arrived on the same October 31, 1941 transport, under the same orders from The Protectorate for transport and later extermination of on Transport D to the Lodz Ghetto. [18]

### 1948 to 1990 – Inability to Make Claims for Restitution of Popper Real Property & The Popper Collection

116.    In February 1948, the Third Republic of Czechoslovakia was transformed into a socialist republic in which personal freedoms, rights to property and the ability to make restitution claims.

117.    From the 1950s to the 1990s, it was impossible for The Popper heirs to make or attempt to make claims for restitution of The Popper Collection.

## 1990s to 2011 Restitution Claims for Popper Real Property & The Popper Collection

118.    Under the 1991 Extrajudicial/Out-of-Court/Voluntary Restitution Laws and The Benes Decrees, The Popper Heirs are recognized as legitimate heirs to Richard and Regina Popper and are permitted to recover the buildings in which The Popper Collection was stored.

---

[18]    This is the same type of outrageous argument used by Swiss and other banks, including Banks in The Czech Republic, which denied Holocaust victims from access to accounts of dead Holocaust victim relatives, because the persons making the claims could not produce death certificates from the Nazis who exterminated the original depositor victims.

30

119.    The Holocaust Act of 2000 declared that:

*a.  § 1 (2) (Looted) Assets in state-owned institutions, listed in the Annex to this Act,
shall be transferred free of charge to the ownership of the Jewish Museum in Prague
within 30 days from the effective date of this Act.* [19]*;*

*b.  § 2 (1) By June 2002, The Federation of Jewish Communities in The Czech
Republic, shall submit to the Government a list of things according to § 1, paragraph
1, which it determines are to be transferred.* [20]

120.    In March 1992 Plaintiff's co-owner, Klepetář, submitted a claim for Popper's
real property in Brno City Court pursuant to Act No. 87/1991 Coll. "on Extrajudicial
Rehabilitation".

121.    However, at that time the existence and location of The Popper Collection
was not known and therefore could not have been claimed.

122.    In 2005, a Czech Regional Court found that Klepetář, Plaintiff's co-owner, was
the heir / successor entitled to restitution of property belonging to Richard and Regina Popper.
*See decision of the Regional Court in Brno of 18 October 2005, ref. 33712004 15 Co),*

123.    In 2007, The Czech Regional Court of Appeals found that Klepetář, Plaintiff's co-
owner, (a) was an heir / successor entitled to restitution of property originally belonging to
Richard and Regina Popper in accordance with The Benes Decrees, specifically Presidential
Decree No. 5/1945 Coll. and Act. No. 128/1946 Coll. and (b) his claim was timely in accordance
with Act. No. 87/91 Coll. as amended (and particularly the Act no. 116/1994Sb.).  Specifically
the Court found that:

---

[19]    The full text in Czech of the excerpted language from the Holocaust Act of 2000 is as follows: *(2) Věci ve
vlastnictví státu uvedené v příloze k tomuto zákonu se převedou bezúplatně do vlastnictví Židovského muzea v Praze
do 30 dnů ode dne nabytí účinnosti tohoto zákona.*

[20]    The full text in Czech of the excerpted language from the Holocaust Act of 2000 is as follows: *(1)
Federace židovských obcí v České republice do 30. června 2002 předloží vládě seznam věcí podle § 1 odst. 1, ve
kterém určí, komu mají být předmětné věci bezúplatně převedeny.*

    a.  The right to restitution under Presidential Decree No. 5/1945 Coll. and Act. No. 128/1946 Coll. belonged to (Richard Popper's) heirs, among whom was also the mother of the (Michal and Jan Klepetar) . . . claim for restitution was properly applied and (timely) . . . due to the fact that these persons (properly applied for restitution) . . . according to the Act. No. 87/91 Coll. as amended (particularly the Act no. 116/1994Sb.). [21]

    b.  The (claimants are) . . . entitled to obtain property under Act No. 87/1991Sb. on extrajudicial rehabilitations . . . the subject property (is subject to restitution under) one of the methods specified in the law . . . (and) the applicants are authorized persons (or their successors) (to the original owner Richard Popper). [22]

124.    On October 26, 2010, the Brno City Court found that Klepetář, Plaintiff's co-owner, (a) was an heir or successor and as defined in § 3, paragraph 2 of Law No. 87/1991 Coll. entitled to restitution of property originally belonging to Richard and Regina Popper in accordance with The Benes Decrees, specifically Presidential Decree No. 5/1945 Coll. and Act. No. 128/1946 Coll. and (b) his claim was timely in accordance with Act. No. 87/91 Coll. as amended (and particularly the Act no. 116/1994Sb.).  The Court explained, in part, that:

    a.  As to the question whether the two (claimants) are or are not authorized persons as defined in § 3, paragraph 2 of Law No. 87/1991 Coll., (the) Court undoubtedly reached the conclusion . . . , yes.  . . . § 3 paragraph 2 of Law No. 87/1991 Coll. (provides) . . . The authorized person is an individual who meets the conditions set out in paragraph 1, . . . pursuant to § 6 . . . under Presidential Decree No. 5/1945 Coll., or pursuant to Act No. 128/1946 Coll. . . . if the transfer or assignment of property rights (are) declared to be invalid . . . due to racial persecution . . . , and (if the transfer was made before 25 February 1948 (then the

---

[21]    The full text in Czech from the Czech Regional Court decision is as follows: *"Svůj nárok odůvodňují tím, že vlastníkem všech uvedených nemovitostí byl na základě kupní smlouvy z 30. let minulého století Richard Popper, který byl v době druhé světové války spolu se svojí rodinou pro svůj židovský původ odeslán do koncentračního tábora, kde všichni zahynuli. Nárok na restituci majetku dle Dekretu prezidenta č. 5/1945 Sb. a zák. č. 128/1946 Sb. náležel jeho dědicům, mezi kterými byla též matka žalobců a), b) MUDr. Edita Klepetářová. Vzhledem k liknavosti úřadů ohledně projednání jejich dědictví, k rozhodnutí o tomto restitučním nároku nedošlo a to přesto, že nárok byl řádně a ve lhůtě uplatněn. Po roce 1948 pak na základě vyhl. č. 303/1952 úředního listu došlo k převzetí tohoto majetku státem."*

[22]    The full text in Czech from the excerpted section of the decision of the Czech Regional Court is as follows: *"V dané věci je možno uvést, pokud jde o to, zda majetek, jehož vydání se žalobci v rámci tohoto řízení domáhají, přešel na stát jedním ze způsobů předvídaných zákonem č. 87/1991 Sb., je možno odkázat na předchozí rozhodnutí odvolacího soudu, kde se odvolací soud k těmto otázkám podrobně vyjádřil (viz rozhodnutí Krajského soudu v Brně ze dne 18. října 2005, čj. 15 Co 33712004). Stejně tak je možno na toto rozhodnutí odkázat i ohledně závěrů o tom, že žalobci a), b) jsou oprávněnými osobami, a to včetně nepřípadné námitky ze strany žalovaných ohledně vypořádání restitučního nároku v rámci Československo-britsko-francouzské dohody."*

32

claimant has) satisfied . . . § 2 paragraph 1 letter c) of the Act . . . (and) according to § 3 paragraph 3 of Act No. 87/1991 Coll. as amended by Act No. 116/1994 Coll., i. . .  (the claimant) is entitled to the whole thing any of them. [23]

c. . . . it is clear that an authorized person . . . may not always be the original owner of the only things but (may still be the) legal successor. To the question, who is an authorized person pursuant to § 3 paragraph 2 of Act No. 87/1991 Coll. on Extrajudicial Rehabilitation (As amended by Act No. 116/1994 Coll.) . . . (and pursuant to) Presidential Decree No. 5/1945 no., (and) pursuant to Act No. 128/1946 Coll . . . there is no doubt that the person on the day of the transition . . . was no longer the original owner of the property Mr. Richard Popper, since he was declared dead at 27 December 1994 (the persons who inherit or succeed) to this claim (are his) legal successor . . . (and these) successor individuals are undoubtedly (Richard Popper's) heirs.  The evidence (before) the court showed that inheritance application pursuant to legal succession (went to) . . . nephew Kurt Popper, niece Herta Spielmannová, niece Helga Wassermannova, niece Trudi Saxova, nephew Henry Mandl, niece Gerta Keller's and niece Dr.. Edita Klepetářová, the mother of (claimants). [24]

d. Dr. Edita Klepetářová (the mother of the claimants) was authorized person in relation to the (entire restitution claim of Richard Popper). Dr. Edita Klepetářová then died, according to the documentary evidence submitted on 8 October 1978, and pursuant to § 3 paragraph 4 of Act No. 87/1991 Coll. . . . the authorized persons to take her place include her children. This means that the two (claimants) as sons Dr. Edita Klepetářové have the status of authorized persons within the

---

[23]     The full text in Czech from the excerpted section of the decision of the Czech Regional Court is as follows: *"Pokud jde o otázku, zda oba žalobci jsou nebo nejsou oprávněnými osobami ve smyslu § 3 odst. 2 zákona č. 87/1991 Sb., dospěl soud k nepochybnému závěru, že ano. V této souvislosti je třeba poukázat na znění ustanovení § 3 odst. 2 zákona č. 87/1991 Sb., kdy oprávněnou osobou je fyzická osoba, která splňuje podmínky stanovené v odst. 1, a která v den přechodu věci na stát podle § 6 měla na ni nárok podle dekretu prezidenta republiky č. 5/1945 Sb., nebo podle zákona č. 128/1946 Sb., pokud k převodu nebo přechodu vlastnického práva prohlášeným za neplatné, podle těchto zvláštních předpisů došlo z důvodu rasové persekuce a tento nárok nebyl po 25. 2. 1948 uspokojen z důvodů uvedených v § 2 odst. 1 písm.c) zákona. Dle § 3 odst. 3 zákona č. 87/1991 Sb. ve znění novely zákona č. 116/1994 Sb., bylo-li dnem přechodu věci na stát oprávněných osob uvedených v odst. 2 více, je oprávněn osobou k celé věci kterákoliv z nich."*

[24]     The full text in Czech from the excerpted section of the Czech Regional Court of Appeals decision is: *Z uvedeného je tedy zřejmé, že oprávněnou osobou v takovémto případě nemusí být vždy jen původní vlastník věci, ale také jeho právní nástupce. Pro posouzení otázky, kdo je oprávněnou osobou podle § 3 odst. 2 zákona č. 87/1991 Sb. (ve znění zákona č. 116/1994 Sb.) je rozhodující zjištění, kdo byl osobou, která splňovala předpoklady vyplývající z ustanovení § 3 odst. 1, tj. je státním občanem České republiky a její věc přešla do vlastnictví státu v případech uvedených v § 6 téhož zákona, a která v den přechodu věci na stát měla na ni nárok podle Dekretu prezidenta republiky č. 5/1945 Sb., nebo podle zákona č. 128/1946 Sb. V tomto případě je nepochybné, že osobou, která v den přechodu věci na stát měla na ni nárok podle zákona č. 128/1946 Sb., nebyl již původní vlastník těchto nemovitostí pan Richard Popper, jelikož ten byl prohlášen za mrtva je dni 27. 12. 1994, ale osobami, kterým tento nárok příslušel byly již jeho právní nástupci. Právními nástupci fyzické osoby jsou nepochybně dědicové. Z důkazů provedených soudem vyplynulo, že dědickou přihlášku na základě zákonné posloupnosti s dobrodiním soupisu, pak podali synovec Kurt Popper, neteř Herta Spielmannová, neteř Helga Wassermannová, neteř Truda Saxová, synovec Jindřich Mandl, neteř Gerta Kellerová a neteř MUDr. Edita Klepetářová, tedy matka žalobců.*

33

meaning of § 3, paragraph 4 letter c) of Act No. 87/1991 Coll. [25]

e. . . . The decision of the Supreme Court, file no. Cdon 28 1726/2000, which shows that to (prove one is an) authorized person pursuant to § 3 paragraph 2 of Law No. 87/1991 Coll. (all that is needed is evidence of) the existence of a claim under Decree No. 5/1945 or Act No. 128/1946 Coll., [26]

f. Restitution Act No. 87/1991 Coll. in § 1, paragraph 1 proclaims that it seeks to alleviate some property injustices committed against the principles of a democratic society, respectful of citizens' rights, proclaimed in the International Conventions and their related international pacts and civil, political, economic, social and cultural rights. The Court then considers that the law itself can not capture namely all practices that would lead to such violations, and therefore marked out only a basic moral principle explanatory, and which is based on fundamental human and civil rights. [27]

g. The Court therefore concluded unequivocally that both applicants are authorized persons pursuant to § 3 paragraph 4 letter c) of Act No. 87/1991 Coll., after (their) mother, Dr. Edit Klepetářova (that they have) meet the requirements of (being an) authorized person as defined in § 3 paragraph 2 of Law No. 87/1991 Coll. in relation to all property that went into state ownership in the manner suggested in § 6, paragraph 2 of Law No. 87 / 1991 Coll. during the relevant period, i.e. 25 February 1948 onward, . . . (that the claim is a) claim of political persecution and

---

[25]     The full text in Czech from the excerpted section of the Czech Regional Court of Appeals decision is: *Z uvedeného je tedy zcela zřejmé, že MUDr. Edita Klepetářová nebyla v postavení oprávněné osoby, která by odvíjela svůj nárok ve smyslu ustanovení § 3 odst. 4 zákona č. 87/1991 od původní oprávněné osoby Richarda Poppera, ale naopak ona sama měla přímo postavení oprávněné osoby ve smyslu ustanovení § 3 odst. 2 zákona č. 87/1991 Sb., jelikož byla jednou z osob majících nárok vyplývající ze zákona č. 128/1946 Sb. Dle § 3 odst. 3 zákona č. 87/1991 Sb., bylo-li v den přechodu na stát oprávněných osob uvedených v odst. více, je oprávněnou osobou k celé věci kterákoliv z nich. Z toho tedy plyne, že MUDr. Edita Klepetářová byla oprávněnou osobou ve vztahu k celé věci (k souboru věci), jichž se restituční nárok dotýká. MUDr. Edita Klepetářová pak zemřela, jak vyplývá z předložených listinných důkazů, dne 8. 10. 1978, a podle § 3 odst. 4 zákona č. 87/1991 Sb., jsou pak na jejím místě oprávněnými osobami mimo jiné její děti. To znamená, že oba žalobci jako synové MUDr. Edity Klepetářové mají postavení oprávněných osob ve smyslu ustanovení § 3 odst. 4 písm.c) zákona č. 87/1991 Sb.*

[26]     Full Czech text from excerpted section of Czech Regional Court of Appeals decision is: *V této souvislosti je třeba poukázat na dější judikaturu (srovnej rozhodnutí Nejvyššího soudu ČR, sp. zn. 28 Cdon 1726/2000) z níž vyplývá, že pro naplnění znaků oprávněné osoby dle § 3 odst. 2 zákona č. 87/1991 Sb. stačí existence nároku dle dekretu č. 5/1945 nebo zákona č. 128/1946 Sb., pokud je podložena minimálními skutkovými okolnostmi o tom, že byl uplatněn. V daném případě byl nárok uplatněn dne 17.6. 1949, tedy v poslední den lhůty, jak vyplývá ze zápisu v pozemkové knize, a to jménem pozůstalosti, což je možné (srovnej § 4 odst. 1 zákona č. 128/1946 Sb.).*

[27]     The full text in Czech from the excerpted section of the Czech Regional Court of Appeals decision is: *Restituční zákon č. 87/1991 Sb. v § 1 odst. 1 proklamuje, že se snaží zmírnit některé majetkové křivdy spáchané v rozporu se zásadami demokratické společnosti, respektující právo občanů, vyhlášená v Mezinárodních úmluvách a na ně navazujících Mezinárodních paktech a občanských, politických, hospodářských, sociálních a kulturních právech. Soud je pak toho názoru, že sám zákon nemůže podchytit jmenovitě veškerá jednání, která by vedla k tomuto porušování, a proto vytýčil pouze základní morální výkladový princip, který spočívá a vychází ze základních lidských a občanských práv.*

(violation of) due process in violation of generally recognized human rights and freedoms (based on discriminatory nature of prior decisions and) other improper termination of post-war restitution proceedings discrimination (and) . . . the fact that (there was no) timely filed decision on the prior restitution claims at all. This omission (to timely file a decision) made it basically impossible (for claimant's predecessors) to prosecute (their claim) for restitution through the Restitution Act. The legal conclusions of the (Bruno Regional Court, No. 15 Co 337/94 of 18 10th 2005) that the two applicants are . . . the legal persons (entitled to make the restitution claim as successors to Richard Popper) is correct. [28]

125.    Despite these findings as to the status and standing of Klepetář, Plaintiff's co-owner, Defendants Czech Republic and Czech Museums refused to transfer The Popper Collection to the Jewish Museum of Prague, refused to comply with directives given by the Federation of Jewish Communities of The Czech Republic, refused to comply with the 2004, 2007 and 2010 Orders of the Czech Regional Court in Brno and the Czech Regional Court of Appeals in Brno, Czech Supreme Court in Brno and has continued to retain possession and control over The Popper Collection.

Since the 1990s, whatever claims made by Klepetář, Plaintiff's co-owner, on behalf of The Popper Heirs to attempt to recover the restitution of The Popper Collection were met with obfuscation, concealment of evidence, lies and even violations of Czech, EU, US and International Laws, treaties and obligations to victims of Nazi persecution.

126.    In fact, some of The Popper Collection was contained in the same buildings the

---

[28]    The full text in Czech from the excerpted section of the Czech Regional Court of Appeals decision is: *Soud tedy dospěl zcela jednoznačně k závěru, že oba žalobci jsou oprávněnými osobami podle § 3 odst. 4 písm.c) zákona č. 87/1991 Sb., a to po své matce MUDr. Editě Klepetářové, splňující předpoklady oprávněné osoby ve smyslu ustanovení § 3 odst. 2 zákona č. 87/1991 Sb., a to ve vztahu ke všem věcem, které přešly do vlastnictví státu způsobem předpokládaným v § 6 odst. 2 zákona č. 87/1991 Sb. v rozhodném období, tj. po 25.2. 1948, když dle názoru soudu lze za neuspokojení nároku z důvodu politické persekuce a postup porušující obecně uznávaná lidská práva a svobody považovat nejenom samotné rozhodnutí soudu, či správního orgánu, obsahující odůvodnění, z něhož jasně vyplývá diskriminační povaha těchto rozhodnutí, ale i jiný způsob ukončení poválečného restitučního řízení motivovaný diskriminací navrhovatele, tedy zcela evidentně i tu skutečnost, že nebylo rozhodnuto o včas podaném restitučním nároku vůbec. Touto nečinností by byla, pakliže by k ní soud nepřihlédl, v podstatě znemožněna možnost žalobců domáhat se navrácení majetku cestou restitučního zákona. Právní závěry soudu prvého stupně, pokud se týká skutečnosti, zda oba žalobci jsou nebo nejsou právními osobami, byly potvrzeny mimo jiné i v rozhodnutí Krajského soudu v Brně, č. j. 15 Co 337/94 ze dne 18. 10. 2005, kde se Krajský soud v Brně s názorem soudu prvého stupně, i s jeho argumentací, ztotožnil.*

Nazis stole from Richard and Regina Popper, that were restituted to The Popper Heirs under the 1992 General Restitution Laws and The Benes Decrees.  However, Klepetář and The Popper Heirs were / are not allowed to recover paintings from The Popper Collection that were hanging in the same buildings that were restituted and both of which were stolen at the exact same time by the Nazis.

127.    At all times from the 1940s to present, The Popper Collection has been in Prague and has continuously been in the custody and possession and controlled (i) from 1940 to 1945 by The Protectorate, together with local Czechoslovakian, officials and authorities, who originally stole and stored it; (ii) from 1945 to 1948 by the authorities of The Third Czechoslovak Republic; (iii) from 1948 to 1960 by the authorities and officials of The Czechoslovak Republic; (iii) from 1960 to 1990 by the authorities and officials of The Czechoslovak Socialist Republic; (iv) from 1990 to 1992 by the authorities and officials of The Czech and Slovak Federal Republic; and (v) (iii) from 1993 to the present by the authorities and officials of The Czech Republic. [29]

128.    In June 2009, upon The Czech Republic's adoption of an Anti-Discrimination Act Czech Minister Czech Human Rights and Minorities Minister Michael Kocáb proclaimed *"By approving the Anti-Discrimination Act, the lower house and political representatives have finally shown they are aware not only of their obligations vis-a-vis EU legislation, but that it is necessary to establish a specific legislative framework for cases of human rights violations"*.

129.    The 2009 Anti-Discrimination law precisely details the situations in which protection against discrimination is to be provided, how, and to whom. The law bans unequal

---

[29]    The Czech Republic, The Gallery and The Documentation Center have withheld all evidence other than the two lists and inventories that Plaintiff has attached as Exhibit 1.  However, Plaintiff believes there is additional credible evidence in Defendants possession that will show transfers of control or different storage locations, and sales of some of the pieces from The Popper Collection.

treatment on the basis of sex, age, disability, race, ethnic origin, nationality, sexual orientation, religious affiliation, faith or world-view.  However, as regards the claims to The Popper Collection, The Czech Republic violated this law by its passage of The Holocaust Act of 2000 that discriminated against The Popper Heirs and other survivors and heirs of Holocaust victim families for whom no living blood relatives below a certain relationship level were still living at the time of the claim.

130.    In June 2009, The Czech Republic hosted a world conference to deal with the unresolved issue of Holocaust Era Looted Assets (also known as "The 2009 Prague Conference"), and passed The Terezin Declaration. *See http://www.eu2009.cz/en/news-and-documents/news/terezin-declaration-26304/*

131.    According to the principles of Terezin Declaration, The Popper Collection should have been restituted and Defendants Czech Republic and Defendant Museums should have assisted The Popper Heirs in their efforts to trace, locate and secure restitution of The Missing 80 + Paintings.  However, that was not done.

132.    Prior to The 2009 Prague Conference, Defendants Czech Republic and Defendant Museums possession of reports confirming the fact that they were in possession of The Popper Collection and that it was subject to restitution. [30]  However, the Defendants Czech Republic and

---

[30]    Upon information and belief, the full and formal copy of The 2000 Report which has been withheld and concealed from Plaintiff and The Poppers heirs places The Popper Collection in a category of importance to the restitution claims of heirs to the Emil Freund, a Prague lawyer and collector who was killed during the Holocaust, reacquired 32 paintings and drawings that had been in the custody of the Gallery for decades. But the Ministry of Culture classified 13 of the looted artworks as cultural treasures, a designation that prevents them from being taken out of the country.  The Freund Heirs and The Popper Heirs had the same pedigree of claims and their paintings were in the custody, possession and control of The Czech Republic in the Gallery.  After discovering that the Freund paintings were in the Gallery, The Czech Republic and The Gallery choose to give the Freund paintings to the Jewish Museum of Prague and the Jewish Museum of Prague in turn gave the Freund paintings to the Freund relatives.  However, The Czech Republic and The Gallery discriminated against The Popper Heirs and treated them and their claims differently to the claims of the Freund Heirs and refused to do the same thing and refused to follow the same procedure for The Popper Collection. These actions in relation to The Freund Collection demonstrated an intentional waiver and change of what they claimed was the applicable law regarding certain types of claims and the status of certain claimants. And, by only waiving it for The Freund Collection and refusing to waive it for The

Defendant Museums discriminated against the Popper Heirs and refused to restitution The Popper Collection.

133.    Klepetář and The Popper Heirs were shut out of The 2009 Prague Conference and the issue of the Popper Collection was not addressed.

134.    After the commitments made by The Czech Republic at The 2009 Prague Conference to the United States and other countries to honor its obligations to restitute looted artwork and to assist heirs such as The Popper Heirs, with restitution claims and their efforts to locate, identify, secure and recover looted artwork, US Ambassador Stuart Eizenstat returned and reported to the US Senate and specifically addressed the plight of the claims by The Popper Heirs and testified that notwithstanding the commitments made *"the program has not been carried out"*.

135.    As a result, there were formal calls by multiple US Senators and public officials that called upon The Czech Republic, to honor its' restitution obligations and references were made to Klepetář and the claims of The Popper Heirs. *See Congressional Record July 8, 2009 Page S7226 - http://www.gpo.gov/fdsys/pkg/CREC-2009-07-08/pdf/CREC-2009-07-08-pt1-PgS7226.pdf#page=1.*

136.    Also shortly after The 2009 Prague Conference, Michaela Sidenberg [31], curator for visual art at the Jewish Museum in Prague, said that Holocaust survivors and their families –

---

Popper Collection, The Czech Republic and The Gallery further discriminated against The Popper Heirs.

[31]    Michaela Sidenberg was an expert employed by the Czech Republic to research and author sections of the report entitled *"Artifacts from Jewish property In The Czech Lands 1938-1945. - Unlawful interference with property rights, their scope and outline of the subsequent fate this property. The report of the expert team to clarify the historical and economic issues Aryanization Jewish property"* established by and the Joint Working Commission *Czech Government Resolution Republic of 25 November 1998 No. 773rd*   Ms. Michaela Sidenberg is a formally an employee of The Jewish Museum of Prague as Head of Department of Collection of Painting, Graphic Art, Drawing and Photographic.  *See http://www.jewishmuseum.cz/en/acontact.htm.* Prior to filing this lawsuit, Plaintiff and The Popper Heirs sought to a copy of The 2000 Report, authored by Ms. Sidenberg, from The Jewish Museum, the Director Leo Pavlat claimed that he was NOT permitted to provide a copy of The 2000 Report – presumably by some directive or understanding with The Czech Republic.

like The Popper Heirs - are repeatedly stonewalled in The Czech Republic, despite official policy to make it simple for them to file claims for artwork taken by the Nazis. *"It's like a hot potato being thrown around," and "claimants are kicked around from one bureaucracy to another. Everybody is just looking for some alibi and to avoid taking responsibility" See www.washingtonpost.com/wp-dyn/content/article/2009/06/27/AR2009062702399.html.*

137.    In November 2011, the Prime Minister of The Czech Republic wrote Klepetář and took the position that there would be no restitution of The Popper Collection and that there was no way to open any new restitution process because to do so would interfere with the *"stability of property relations in an already functioning democratic system"* that *"the property no longer belongs private owners who have a legitimate expectation"*. The Czech Prime Minister claimed – albeit falsely – that time limitations to file restitution claims had expired and would not be extended. *See Exhibit 5 - Letter of Hon. Prime Minister Petr NEČAS to Ing. Michal Klepetář.*

138.    Contrary to the representations of Defendant Czech Republic's Prime Minister, and as further evidence of the discrimination related to restitution of looted art and restitution of The Popper Collection in particular, from March and April 2012 the Czech Government and negotiated and agreed to restitute Catholic Church property that had come into the possession of The Czech Republic after the Communists seized power in 1948 and that the restitution plan to the Church would be worth some 134 billion koruna, or about $7 billion. *See http://www.nytimes.com/2012/04/03/world/europe/03iht-czech03.html.*

139.    In March 2012, demand letters were delivered to officials of The Czech Republic and Czech Museums reminding them of their obligations to restitute The Poppper Collection, to assist the Popper Heirs efforts to research, track, locate and restitution The 80+ Missing Paintings, and specifically requested and demanded among other things:

39

a.  Production or publication of all documents and reports related to The Popper Art Collection; - including The 2000 Report;

b.  Agree to allow / direct the inspection, photographing and videographing of any and all portions of The Popper Art Collection in their custody, possession or control; and

c.  Cooperate with The Popper Heirs, relatives, descendants, heirs, successors and persons with interest to The Popper Collection, in efforts (a) to secure The Popper Collection until restitution is made of those pieces in their custody, possession or control and (b) to locate the missing pieces of The Popper Collection so that restitution can be made of those pieces that are not in their custody, possession or control.

140.  In response to Plaintiff's 2012 Demands,

a.  NG admitted to its retention and control of The Popper Collection; however informed Plaintiff that it had no obligation to restitute The Popper Collection;

b.  The Documentation Center (another organ of The Czech Republic) refused to produce its copy of The 2000 Report or other documents unless Plaintiff and The Popper Heirs came in and filed a form requesting the materials and paid fees; and

c.  The Czech Republic never responded and ignored the requests.

141.  Fifty paintings from The Popper Collection remain in and are wrongfully being retained and withheld from The Popper Heirs, and documents related to the entire Popper Collection are also being withheld from The Popper Heirs by Defendants Czech Republic and Defendants Museums.

142.  A formal Demand for the return and restitution of the entire Popper Collection has been delivered to and refused by Defendants Czech Republic and Czech Museums.

40

## THIS ACTION IS TIMELY

143.   The looting of The Popper Collection constituted acts of genocide and other violations of international law, for which no statute of limitations period applies.

144.   The non-applicability of a statute of limitations to Plaintiff's claims is confirmed by the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, 754 U.N.T.S. 73 *(November 26, 1968), which was adopted and ratified by The Czech Republic on February 22, 2992. See http://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-6&chapter=4&lang=en.* By adopting and ratifying the Convention, Defendant Czech Republic, voluntarily and intentionally waived any reliance on statutes of limitation regarding The Popper Collection and is otherwise estopped from asserting any statute of limitation defense under its or any other law.

145.   Defendants Czech Republic and Czech Museums never obtained ownership rights to The Popper Collection, including those potions that were returned from abroad, following WWII.

146.   Instead, Defendants Czech Republic and Czech Museums continued possession of The Popper Collection constituted a bailment, for which the statute of limitations has not run.

147.   Knowing that their behavior violated international law, and knowing that they did not have, and could not possess, good title to the looted The Popper Collection, and instead held the property merely as bailees, at no time since the end of WWII have Defendants made any reasonable attempt to restitute The Popper Collection. Instead, Defendants hid behind the Iron Curtain, took advantage of the Popper Heirs' inability to demand the return of their property, and profited from their unlawful possession of The

41

Popper Collection. Defendants' knowing conduct stops them from interposing any time bar defense to these claims.

148.   In addition, no statute of limitations has begun to run on the causes of action asserted herein because Defendants' misconduct is continuing; Defendants have not made any reasonable attempt to restitute The Popper Collection, to disgorge their illicit profits, or to otherwise compensate the Popper Heirs. Defendants have continued to reap profits as a result of their unlawful actions and are therefore estopped from interposing any type of time bar defense to these claims.

149.   To the extent that any statute of limitations period could be construed as applying to Plaintiff's claims, this action is brought within the time limits of that statute of limitations, or any such statute has been equitably tolled.

150.   Any statute of limitations applicable to Plaintiff's claims was tolled during the pendency of WWII.

151.   Any statute of limitations applicable to Plaintiff's claims was also equitably tolled following WWII because Defendants' wrongful conduct, and extraordinary circumstances outside of Plaintiff's or co-owners or predecessor's control, prevented the timely filing or assertion of claims.

152.   During the Communist era, Klepetář, Plaintiff's co-owner and the Popper Heirs, lacked access to records and information that could have enabled them to learn the fate of The Popper Collection. Even if the Popper Heirs had been able to obtain such information, the Popper Heirs could not have obtained relief against Defendants in The Czech Republic because there was no independent judiciary, Czech Republic did not

42

recognize individual property rights, and because the Popper Heirs feared reprisals against family members who had remained in Czech Republic

153.    After the end of the Communist Era, starting in 1992 to 2000, Klepetář and The Popper Heirs filed claims for restitution of the real estate originally belonging to Richard and Regina Popper.

154.    In 2000, after they discovered the existence of The Popper Collection, Klepetář and The Popper Heirs filed claims for its restitution.

155.    For years, Defendants Czech Republic and Czech Museums actively misled The Popper Heirs and dragged their claims out, leading The Popper Heirs into believing that it accepted their ownership rights to The Popper Collection, was giving the claims serious consideration, and repeatedly advised them that it would reach a favorable decision.   It was only in January 2010 that Defendant Czech Republic issued its final decision that it would not honor its obligation to return The Popper Collection to the Popper Heirs.  The 2010 decision made clear that any further demand by The Popper Heirs for restitution of any potion of The Popper Collection would be futile.

156.    No statute of limitations bars Plaintiff's claims.

## CLAIMS

### FIRST CLAIM FOR RELIEF  (BAILMENT)

157.    Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

158.    When Defendants Czech Republic and Czech Museums accepted possession of the Popper Collection, they did so with the express knowledge that The Popper Collection belonged to The Popper Heirs.

43

159.    Defendants at no time had more than a custodial interest in The Popper Collection pursuant to applicable laws and post-war treaties, which required Defendants Czech Republic and Czech Museums to safeguard the property for the benefit of its rightful owners.

160.    Defendants' possession of The Popper Collection following WWII constituted an express or implied-in-fact bailment contract for the benefit of the Plaintiffs.

161.    Under the bailment contract, Defendants Czech Republic and Czech Museums owed the Popper Heirs a duty of care to protect the property and to return it to them. Defendants at all times understood that The Popper Collection remained the property of Plaintiff, Klepetář and The Popper Heirs who retained the right to demand its return.

162.    Defendants have received substantial financial benefits from their possession of The Popper Collection that far exceed any costs they have expended in storing The Popper Collection.

163.    Plaintiff, Klepetář and The Popper Heirs presently own and have a right to possession of The Popper Collection.

164.    Plaintiff, Klepetář and The Popper Heirs have demanded the return of potions of The Popper Collection from 2000 to present and Defendants breached their duties by rejecting the demands. Any further demand would be futile.

165.    Plaintiff, Klepetář and The Popper Heirs have been damaged by Defendants' breach of their bailment obligations and refusal to return The Popper Collection and is entitled to restitution, or payment of their interest in The Popper Collection, which interest is valued in excess of $ 50 million and will be subject to proof at trial.

44

## SECOND CLAIM FOR RELIEF  (CONVERSION)

166.    Plaintiff incorporate paragraphs 1 through 156 of the Complaint as if fully set forth herein.

167.    By refusing to return The Popper Collection to Plaintiff, Klepetář and The Popper Heirs pursuant to the bailment relationship among the patties, Defendants knowingly converted The Popper Collection.

168.    To the extent that Defendants purported to convert or otherwise knowingly exercised ownership rights over The Popper Collection that were inconsistent with the terms of the bailment relationship, Defendants unlawfully concealed their conversion from Plaintiff, Klepetář and The Popper Heirs.

169.    At no point did Plaintiff, Klepetář and The Popper Heirs consent to Defendants' exercise of ownership rights over The Popper Collection.

170.    Plaintiff, Klepetář and The Popper Heirs have been damaged by the conversion of their property and are entitled to restitution, or payment of their interest in The Popper Collection, which interest is valued in excess of $ 50 million and will be subject to proof at trial.

## THIRD CLAIM FOR RELIEF  (CONSTRUCTIVE TRUST)

171.    Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

172.    Defendants wrongfully obtained The Popper Collection through violations of international law, duress and deceit. Defendants have continued to wrongfully detain The Popper Collection despite Plaintiff, Klepetář and The Popper Heirs demand for its

45

return.

173.    As a result, Plaintiff, Klepetář and The Popper Heirs are entitled to the imposition of a constructive trust on the works of The Popper Collection that are currently in the possession of Defendants, obligating Defendants to return the works or to compensate them for their interest in the works, which interest is valued in excess of $ 50 million and will be subject to proof at trial.

174.    In addition, Plaintiff Klepetář and The Popper Heirs are entitled to an accounting of the works of at subject to the constructive trust.

### FOURTH CLAIM FOR RELIEF  (ACCOUNTING)

175.    Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

176.    Defendants have never accounted for the pieces of The Popper Collection, which they have had in their possession for the last sixty years

177.    As a result of the bailment relationship created among the parties, Defendants had a fiduciary duty to return The Popper Collection to Plaintiff, Klepetář and The Popper Heirs upon demand. Defendants have failed to fulfill that duty.

178.    Only Defendants know the whereabouts of all of the pieces of The Popper Collection that are currently within their possession, custody or control.

179.    Plaintiffs have no adequate remedy at law.

180.    Plaintiff, Klepetář and The Popper Heirs are entitled to an accounting of all works from The Popper Collection that are currently in Defendants' possession, custody or control, or which may later come to be in their possession, custody or control, and all monies earned by Defendants there from.

46

## **FIFTH CLAIM FOR RELIEF (DECLARATORY RELIEF)**

181.   Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

182.   An actual case or controversy has arisen between Plaintiff and Defendants concerning the right to ownership and possession of The Popper Collection.

183.   Defendants have wrongfully detained The Popper Collection and have refused to provide restitution to Plaintiff, Klepetář and The Popper Heirs.

184.   Defendants contend that they are not required to restitute The Popper Collection or any portion or interest thereof to Plaintiff, Klepetář and The Popper Heirs because they acquired lawful ownership of The Popper Collection by nationalization, laws in the Czech Republic, adverse possession, statute of limitations, agreement or other means.  Plaintiff, Klepetář and The Popper Heirs contend that Defendants never have obtained good title to any potion of The Popper Collection because the original seizure of the artworks violated Czech Law, international law and the subsequent relationship among Plaintiff, Klepetář and The Popper Heirs and Defendants was that of a bailment. Plaintiff further contends that none of the laws or the agreement relied on by Defendants provided them with good title to The Popper Collection. Thus, the issues in this case are ripe for declaratory relief.

185.   Plaintiff is entitled to a declaratory judgment declaring them to be the owners of The Popper Collection and directing Defendants to return to them any works from The Popper Collection that are now, or which may later come to be, in their possession, or to compensate them for their interest in the works, which interest is valued

in excess of $ 50 million and will be subject to proof at trial.

**SIXTH CLAIM FOR RELIEF**
**(RESTITUTION BASED ON UNJUST ENRICHMENT)**

186.   Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

187.   As described above, Defendants have been unjustly and unlawfully enriched at the expense of Plaintiff, Klepetář and The Popper Heirs.  Defendants obtained The Popper Collection through violations of international law, duress and deceit, and have wrongfully withheld the artworks from Plaintiff, Klepetář and The Popper Heirs.

188.   Plaintiff, Klepetář and The Popper Heirs have no adequate remedy at law.

189.   As a result of Defendants' unjust enrichment, Plaintiff, Klepetář and The Popper Heirs are entitled to restitution of The Popper Collection, or compensation for their interest in The Popper Collection, which interest is valued in excess of $ 50 million and will be subject to proof at trial.

**SEVENTH CLAIM FOR RELIEF**
**(RESTITUTION BASED ON EQUITABLE DISGORGEMENT)**

190.   Plaintiff incorporates paragraphs 1 through 156 of the Complaint as if fully set forth herein.

191.   As described above, Defendants have been unjustly and unlawfully enriched at the expense of Plaintiff, Klepetář and The Popper Heirs.  Defendants obtained The Popper Collection through violations of international law, duress and deceit, and have wrongfully withheld the artworks from Plaintiff, Klepetář and The Popper Heirs.

192.   As described above, Defendants have failed to enact the mechanisms committed to in accordance with (i) Hague Convention of 1907, (ii) the Inter-Allied

Declaration against Acts of Dispossession committed in Territories under Enemy Occupation and Control, London 5 January 1943 (iii) Final Act of the United Nations Monetary and Financial Conference, Bretton Woods, New Hampshire, 1-22 July 1944, Enemy Assets and Looted Property; (iv) the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, and the Nuremberg Charter, (v) 1998 Washington Principles with respect to Nazi-Confiscated Art; (v) Resolution 1205 of the Parliamentary Assembly of the Council of Europe of November 1999; (vi) Declaration of October 2000 of the Vilnius International Forum on Holocaust Era Looted Cultural Assets; (vii) European Parliament Resolution and Report of Committee on Legal Affairs and the Internal Market November 2003; (viii) Joint Declaration of the European Commission and Czech EU Presidency, 29 June 2009; (ix) Terezin Declaration 30 June 2009; and (x) Resolution 41 of the General Conference of UNESCO, regarding Declaration of Principles Relating to Cultural Objects Displaced in Connection with the Second World War, 6 October – 23 October 2010, and were/are to release stolen artwork to heirs and successors and in the event that none can/could be found, they were not permitted to retain and/or profit from stolen art, as it was to be turned over to successors/successor organizations.

193.   Plaintiff, Klepetář and The Popper Heirs have no adequate remedy at law.

194.   As a result of Defendants' unjust enrichment, Plaintiff, Klepetář and The Popper Heirs are entitled to equitable disgorgement of The Popper Collection, or compensation for their interest in The Popper Collection, which interest is valued in excess of $ 50 million and will be subject to proof at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   <u>On the First Claim for Relief</u>: for an order directing Defendants to return to

49

Plaintiff, Klepetář and The Popper Heirs the pieces of The Popper Collection that are now, or come to be, in Defendants' possession, custody or control, or for compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million;

      B.    <u>On the Second Claim for Relief</u>: for an order directing Defendants to return to Plaintiff, Klepetář and The Popper Heirs the pieces of The Popper Collection that are now, or come to be, in Defendants' possession, custody or control, or for compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million;

      C.    <u>On the Third Claim for Relief</u>: for an order declaring that Defendants hold as constructive trustees, for and on behalf of Plaintiff, Klepetář and The Popper Heirs, the pieces of The Popper Collection that are now, or come to be, in their possession, custody or control, and directing Defendants to account to Plaintiff for those works now in their possession, and to deliver to Plaintiff, Klepetář and The Popper Heirs possession of the works or compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million;

      D.    <u>On the Fourth Claim for Relief</u>: for an order directing Defendants to account to Plaintiff, Klepetář and The Popper Heirs for those works from The Popper Collection that are now, or come to be, in their possession, custody or control, and for any monies earned by Defendants thereby, and to deliver possession of the works or compensation therefore to Plaintiff, Klepetář and The Popper Heirs in an amount to be proven at trial, but estimated in excess of $ 50 million;

      E.    <u>On the Fifth Claim for Relief</u>: for an order declaring that Plaintiff Klepetář and The Popper Heirs are the owners of the pieces of The Popper Collection that are now, or come to be, in Defendants' possession, custody or control, and directing Defendants to

50

deliver to Plaintiff, Klepetář and The Popper Heirs possession the works or compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million;

F.      On the Sixth Claim for Relief: for an order directing Defendants to return to Plaintiff, Klepetář and The Popper Heirs, the pieces of The Popper Collection that are now, or come to be, in their possession, custody or control or for compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million; and

G.      On the Seventh Claim for Relief: for an order directing Defendants to equitably disgorge to Plaintiff, Klepetář and The Popper Heirs, the pieces of The Popper Collection that are now, or come to be, in their possession, custody or control or for compensation therefore in an amount to be proven at trial, but estimated in excess of $ 50 million; and

H.      For an order directing Defendants to disgorge any profits earned by Defendants from their unlawful possession of The Popper Collection;

I.      For pre- and post-judgment interest on any award; and

J.      Awarding Plaintiff, Klepetář and The Popper Heirs such other and further relief as this Court deems just and proper.

Dated:       April 19, 2012
             Boca Raton, FL              _____
                                         Victims of Holocaust Art Theft
                                         Edward D. Fagan
                                         P. O. Box 812512
                                         Boca Raton, FL  33481
                                         Tel/Fax # (561) 948-2707
                                         Email: victimsofholocaustarttheft@gmail.com

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Victims of Holocaust Art Theft a fictitious name registered to Edward D. Fagan | The Czech Republic, National Gallery in Prague, Museum of Decorative Arts of Prauge |

**(b)** County of Residence of First Listed Plaintiff   Palm Beach County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Prague, Czech Republic
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Victims of Holocaust Art Theft - Edward D. Fagan, PO Box 812512, Boca Raton, FL 33481 and 8455-07 Arbor Club Way, Boca Raton, FL 33433 Tel-Fax 561-948-2707

Attorneys (If Known)

Note Yet Known

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only) |
|---|---|

II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

12CV 80420 JIC/BSS

III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL INJURY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | ☐ 371 Truth in Lending | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | **Habeas Corpus:** | **IMMIGRATION** |  | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 530 General | ☐ 462 Naturalization Application |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | ☐ 463 Habeas Corpus-Alien Detainee |  | ☐ 950 Constitutionality of State Statutes |
|  |  | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions |  |  |
|  |  | ☐ 550 Civil Rights |  |  |  |
|  |  | ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page)   a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE                    DOCKET NUMBER

**VII. CAUSE OF ACTION**   Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Bailment, Conversion, Constructive Trust, Declaratory Relief, Restitution based on Unjust Enrichment, Restitution based on Equitable Disgorgement
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 450 million   CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   *Edward D Fagan*   DATE   4-19-2012

FOR OFFICE USE ONLY

AMOUNT _____ RECEIPT # _____ IFP _____